**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

MARK WILLIAM ANTEN,

*Defendant - Appellant.*

No. 24-7261

D.C. No.
2:24-cr-00002-
WLH-1

OPINION

Appeal from the United States District Court
for the Central District of California
Wesley L. Hsu, District Judge, Presiding

Submitted April 15, 2026[*]
Pasadena, California

Before: Consuelo M. Callahan, Patrick J. Bumatay, and
Eric C. Tung, Circuit Judges.

Filed July 27, 2026

Opinion by Judge Callahan

---

[*] The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

## SUMMARY[**]

### Criminal Law

The panel affirmed Mark William Anten's jury conviction for transmitting threats to injure another in interstate commerce, in violation of 18 U.S.C. § 875(c).

The panel held that the true-threat statute, 18 U.S.C. § 875(c), requires an objective threat element as well as a subjective mental state element. Whether a statement is a "threat" must be judged through the eyes of a reasonable person. The panel concluded that the jury instructions in this case covered the objective element, although they could have been more clearly formulated.

The panel further held that the district court did not invade the province of the jury in its response to a jury note asking which exhibits were referred to in the indictment.

### COUNSEL

Kedar S. Bhatia and Clifford D. Mpare Jr., Assistant United States Attorneys; Alexander B. Schwab, Assistant United States Attorney, Acting Chief, Criminal Division; Bilal A. Essayli, First Assistant United States Attorney; Todd Blanche, Deputy Attorney General; Office of the United

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

States Attorney, United States Department of Justice, Los Angeles, California; for Plaintiff-Appellee.

Alyssa D. Bell, Cohen Williams LLP, Los Angeles, California, for Defendant-Appellant.

---

## OPINION

CALLAHAN, Circuit Judge:

In an escalating barrage of emails to the Federal Bureau of Investigation (FBI), Mark William Anten eventually declared himself the "UNABOMBER" and stated, "I WILL UNABOMB THE LOS ANGELES FBI HQ." A jury convicted Anten of transmitting threats to injure another in interstate commerce, in violation of 18 U.S.C. § 875(c). Anten now appeals, arguing that the district court's jury instructions omitted an objective element required by the statute. We decide that the statute requires an objective element, but the jury instructions covered it. Anten's other challenge, that the district court invaded the province of the jury, lacks merit too. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

### I.

In 2018, Anten worked as a Confidential Human Source alongside a team of FBI agents on a healthcare fraud investigation.[1] The team of agents, all from the Los Angeles

---

[1] As this appeal follows a jury's verdict, the facts set forth in this section are drawn from the trial record.

field office, included Agents Amir Sharif, Stephanie O'Neal, and Diamond Outlaw.

Agent Sharif, Anten's main handler,[2] soon learned that Anten had "quirks." Anten often appeared "disheveled," left his shoelaces untied, and acted "socially awkward." Anten would send "rambling" emails to his handlers, at times making "outlandish" requests. And once, when passing through a security checkpoint, Anten struggled to remove his belt, forcing Agent Sharif "to actually cut the belt off for [Anten]."

Despite these quirks, Anten proved "really effective" when playing the role of "Donovan," Anten's pseudonym during his undercover work. Anten showcased particular skill at eliciting information from colleagues who worked alongside him at the healthcare company being investigated. Anten's handlers found him to be "a good performer, very intelligent, educated, very clever," "friendly," and "never adversarial."

Anten's partnership with the Los Angeles agents, however, lasted only five months. On September 21, 2018, Anten, playing the role of Donovan, was walking alongside one of his healthcare colleagues, whom the FBI was confidentially investigating. While navigating a stairwell, Anten dropped his water bottle, which fell to the ground, exposing wires from an FBI recording device. Seeing the wires protruding from the broken bottle, the subject individual questioned: "[W]hat is that recording device? . . . Why are there wires sticking out of this water bottle?" Anten attempted to remedy the situation by improvising that the

---

[2] The FBI uses the term "handler" to refer to a case agent working with a Confidential Human Source.

device was something he used for "electrolytes," but Anten's handlers feared that his undercover identity had been compromised. Anten confirmed these fears when he admitted during an FBI debriefing that he had revealed information about his confidential work to others.

The FBI ended its relationship with Anten in October 2018 and told him to cease all contact with Agents Sharif, O'Neal, and Outlaw. But Anten, who had been fired by the healthcare company following the water bottle incident, attempted to communicate with Agent Sharif through emails, calls, and text messages. These communications subsided in 2019.

In July 2023, Anten had another run in with the FBI—this time, with a different field office, a different agent, and a different investigation. When investigating a ransomware attack on a hospital, Agent Elizabeth Pelker of the Las Vegas field office had "come across" Anten and believed he "was in possession of some information pertaining" to the ransomware attack. Agent Pelker began communicating with Anten about this information. This renewed attention from the FBI may have prompted Anten to resume contact with his former Los Angeles-based team because that summer, Anten resumed contact with Agent Sharif through a flurry of emails.

By October, Anten's messages to Agent Sharif intensified. In one such email, Anten wrote: "I know you're aware that I went to your office looking for you last week. I was completely unarmed. You can confirm with your security detail that is there to protect you from psychopaths." The FBI verified, after reviewing security footage, that Anten was not "bluffing" and had in fact visited the FBI's Los Angeles field office.

Around this time, Agent Sharif alerted the FBI's security team to Anten's communications. In his fifteen-year career with the FBI, Agent Sharif had never previously referred a Confidential Human Source to the security team.

Continuing his outpouring of emails, Anten began to compare himself to the Unabomber—a comparison that Agent Sharif found "very troubling." On November 2, 2023, Anten titled an email, "FBI alert, name change," and wrote: "As I am sure you are aware in your extensive background check of me, I was voted most likely to become the next Unabomber after graduate school. The person who ran the poll was so alarmed at printing the results that she put a disclaimer asking me not to unabomb her. Cute." Anten included a reward poster for the Unabomber.

Later that day, Anten listed his similarities to the Unabomber:

> He taught at Berkeley. I went to Berkeley.
> We both obviously love manifestos, and working on my latest and greatest.
> Extremely similar views on technology.
> Both quirky and harmless before the FBI/CIA got a hold of us. Do a little MKUltra and boom. You created your own domestic terrorist.

Anten began signing emails, "the Unabomber."

In another November message, Anten emailed Agents O'Neal and Outlaw, who he called "the gorgeous ladies of the FBI," with Agent Sharif copied. The email, directed to the female agents, stated, "Let's see how far your hero will go to protect you. At some point you will have to answer

questions." Again signed, "The Unabomber." The email also attached a graphic titled, "Playing games with both the FBI and the Unabomber." The graphic portrayed a clown, labeled "Special Agent Amir Sharif," sitting behind a desk under an FBI seal. The graphic disturbed Agent Sharif because the pictured room "triggered a memory" of his "first meeting with Mr. Anten," where they sat in a similar-looking interview room. Agent Sharif interpreted the graphic as portraying himself "as a clown . . . . playing games with the Unabomber."

Throughout November, Anten persisted in sending more emails in which he, among other things, signed off as "the Unabomber"; mentioned a "list," akin to a hit list, of agents who had wronged him; and warned an agent in Washington D.C. that if the agent "even thinks about reporting [Anten] to his superiors, he will rue the day," and that Anten "will personally go to D.C. and find him." And Anten sent another image. In this graphic, "daggers and perhaps a grenade and missiles" rained down on a "soldier in uniform" captioned "Agent Amir," who bled onto the ground while protecting a body captioned, "Stephanie Superstar and Diamond Outlaw."

Not all of Anten's emails struck such a dark tone. Some messages employed sarcasm, proclaiming he "beat Tiger Woods at golf" and "was the Pac-Man champion of Los Angeles." And at times, Anten appeared to relinquish the Unabomber moniker, stating on November 11: "I will no longer be utilizing the Unabomber moniker. It didn't take hold . . . . I'm really not a woodsy type of guy. I would probably kill myself if I tried to make a real bomb. I never took chemistry . . . . The real Unabomber is indeed dead."

Nonetheless, Agent Sharif took precautions.  He ran a criminal background check on Anten as well as a Department of Motor Vehicles check to identify vehicles registered to Anten.  When driving into the parking lot at work, he would scan for Anten's vehicle to "avoid contact" with Anten and potentially report him to security.  Agent Sharif was particularly concerned that Anten's messages kept mentioning the Los Angeles field office because that building is "open to the public," comprising not only the FBI offices but other agencies, leading "a lot of members of the public" to occupy the building during the day.

The FBI security team also reacted to Anten's messages, opening an assessment in Guardian, a computer program used to assess threats.  As part of the assessment, two task force officers from the Guardian unit visited Anten's home on November 20, 2023, and interviewed him for approximately forty-five minutes.  During the interview, Anten remained "calm" and "cooperative" but expressed that "working with the FBI had negatively impacted his life." The Guardian officers encouraged Anten to stop communicating with agents.  But Anten did not stop. Instead, he added the Guardian officers to his list of email recipients, sending them "tens of emails, if not hundreds" over the next several weeks.

Anten's emails continued into December.  In a December 4 message, Anten expressed that his dog was suffering from a tumor, called his former handlers the "criminal trio," blamed them for ending his dog's "perfect streak" on "FBI Spy Operations," demanded that the FBI pay his dog's veterinarian bills, and concluded: "You messed with the wrong American dog.  This isn't ending like you think it is."  Around the same time, Anten titled another

email, "It's only a matter of time," and stated: "I don't care about death or supermax."

On December 6, 2023, Anten sent the three emails that provided the basis for his two-count indictment. Anten sent the first email (the basis for Count One) to Agent Sharif as well as to Agent Amir Ehsaei, the second-highest ranking agent in Agent Sharif's division. Under the subject line, "Poor Scared Agent Amir," the email read:

> Hi Agent Amirs:
>
> SpyBoy called Counter-Terrorism Agents and sent them to my home in order to scare me. Really funny.
>
> Why don't you try that again, tough guy with a gun?
>
> I AM THE UNABOMBER
> I WILL UNABOMB THE LOS ANGELES FBI HQ
> UNABOMB AMERICA
> UNABOMB EARTH
> UNABOMB SOLAR SYSTEM
>
> I am supposed to be in Beverly Hills tomorrow for a meeting.
>
> I will swing by your office if there is time. You enjoyed coming to my work repeatedly. I will be doing the same going forward. I don't send people like you. I am the people.
>
> This ain't over.
>
> Signed,
> UNABOMBER

WE ARE THE PEOPLE
DONOVAN

Not long after, Anten sent another email and an attachment to Agent Sharif, which together provided the basis for Count Two of Anten's indictment.  The email, titled "Next Level Agenda," stated:

> Here is what you three dimwits fail to appreciate.
>
> Charging me with any crime doesn't change what you did under FBI employment.  I can go on a mass murder spree.  In fact, it would be very explainable by your actions.
>
> Keep on reporting me.
>
> You are only reporting yourselves.
>
> Everything captured on video.  Two video streams.  Are you going to Epstein it?
>
> You ain't getting away with this one.
>
> SuperMax or Death.
>
> -Dono

Anten attached a screenshot of a Google search for "how to make a dirty bomb."

The FBI circulated a be-on-the-lookout (BOLO) notice for Anten to FBI personnel across Southern California, warning: "Although there isn't any deemed credible threat, this email is being sent out due to the continuous and ongoing communications received from this individual."

The BOLO described Anten as having "[m]ade threatening comments towards FBI personnel at facilities."

On December 21, 2023, the FBI arrested Anten. Upon searching his home, the FBI found neither weapons nor bomb-making materials. On January 3, 2024, a grand jury indicted Anten on two counts of making threats to injure by interstate communication, in violation of 18 U.S.C. § 875(c). Anten's trial began on June 3, 2024.

As to 18 U.S.C. § 875(c), the district court instructed the jury as follows:

> For the defendant to be found guilty of a count of transmitting in interstate commerce a threatening communication to a person, the government must prove each of the following elements beyond a reasonable doubt:
>
> First, the defendant knowingly transmitted in interstate commerce an electronic communication containing a threat to injure the person of another.
>
> Second, such electronic communication was transmitted for the purpose of issuing a threat with knowledge that the electronic communication would be viewed as a threat or with a conscious disregard of a substantial risk that the communication would be viewed as a threat.
>
> The government need not prove that the defendant intended to carry out the threat.
>
> To determine whether or not the defendant transmitted a threat here, you should consider

the circumstances under which the electronic communication was made, including its context with respect to surrounding conversation, the language the defendant used, and the reaction of those who received the electronic communication.

These jury instructions generally tracked Ninth Circuit Model Instruction 8.13, with two modifications: (1) the district court added the recklessness standard in the third paragraph to reflect the holding of *Counterman v. Colorado*, 600 U.S. 66 (2023), and (2) the district court incorporated the last paragraph at Anten's request.

The district court rejected Anten's request to further define a "threat" as a "serious statement expressing an intention to inflict bodily injury . . . as distinguished from idle or careless talk, exaggeration, or something said jokingly." The district court also rejected Anten's request for an instruction stating, "[f]or a statement to be a threat, the statement must have been made under such circumstances that a reasonable person who heard the statement would understand it as a serious expression of an intent to inflict bodily injury."

The jury began deliberations on June 5, 2024. After about an hour of deliberation, the jury returned a note expressing confusion about which emails were referenced by the indictment: "What specific exhibit #s are counts 1 - 2 referencing?" The court responded: "Counts One and Two

quote or reference Government Exhibits 1193, 1200, and 1203."**3**

By the afternoon, the jury returned a guilty verdict on both counts. Anten timely appeals the judgment, challenging the district court's jury instructions and response to the jury's note.

## II.

Anten argues that 18 U.S.C. § 875(c) requires both an objective and a subjective element. According to Anten, the district court's jury instructions omitted the objective element.

"We review de novo whether a jury instruction misstates the law," and "we review the 'language and formulation' of a jury instruction for abuse of discretion." *United States v. Rodriguez*, 971 F.3d 1005, 1012 (9th Cir. 2020) (citing *United States v. Cortes*, 757 F.3d 850, 857 (9th Cir. 2014)).

To assess whether the jury instructions accurately stated the law, we first consider the elements of the statutory offense. We now confirm what we have previously assumed—that § 875(c) requires an objective threat element as well as a subjective mental state element. *See United States v. Martis*, No. 22-10056, 2024 WL 957522, at *2 (9th Cir. Mar. 6, 2024) ("Assuming without deciding that proof of both a subjective and objective definition of a true threat is required for a conviction . . . ."); *United States v. Liesse*, No. 20-10096, 2021 WL 5275819, at *1 (9th Cir. Nov. 12,

---

[3] For background, exhibit 1193 is the email stating, "I WILL UNABOMB THE LOS ANGELES FBI HQ." Exhibit 1200 is the email stating, "I can go on a mass murder spree." Exhibit 1203 is the attached screenshot of the Google search "how to make a dirty bomb."

2021) ("[W]e will assume without deciding that proof of both [elements] is required.").

To parse out the elements of 18 U.S.C. § 875(c), we begin with the text. Section 875(c) states: "Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both." The text contains at least two elements: (1) "a communication be transmitted" and (2) "the communication contain a threat." *Elonis v. United States*, 575 U.S. 723, 732 (2015).

The statute specifies no "mental state with respect to these elements." *Id.* In *Elonis*, the Supreme Court held that a mental state element must be read into § 875(c). *Id.* at 740 ("The jury was instructed that the Government need prove only that a reasonable person would regard [defendant]'s communications as threats, and that was error. Federal criminal liability generally does not turn solely on the results of an act without considering the defendant's mental state."). The Court declined to address whether a finding of recklessness would suffice. *Id.* In *Counterman*, the Court addressed the constitutional constraints around the mental state element in true threats cases generally, holding that "a mental state of recklessness is sufficient" to satisfy the First Amendment. *See* 600 U.S. at 69 ("[T]he First Amendment still requires proof that the defendant had some subjective understanding of the threatening nature of his statements . . . . The State must show that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence.").

Notable for our purposes, the Supreme Court has evaluated this "subjective mental-state" element separately from the objective "threat" element of the statute: "Whether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat . . . . The existence of a threat depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end." *Id.* at 74–75; *see also Elonis*, 575 U.S. at 733 (Common definitions of 'threat' "speak to what the statement conveys—not to the author's mental state."). *Elonis* portrays the separation of the mental state and threat elements: "[A]n anonymous letter that says 'I'm going to kill you' is 'an expression of an intention to inflict loss or harm' regardless of the author's intent. A victim who receives that letter in the mail has received a threat, even if the author believes (wrongly) that his message will be taken as a joke." 575 U.S. at 733. In other words, a defendant's intent does not determine whether he communicated a threat.

This bifurcation mirrors other areas of First Amendment doctrine. *See Counterman*, 600 U.S. at 75–77 (relying on defamation, obscenity, and incitement law in molding the subjective requirement in true threats cases). For example, to "recover for the injury" of a defamatory statement, a public figure must establish that a statement was false and that "the speaker acted with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* at 76 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)) (citing *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). So too with obscenity. "Obscenity is obscenity, whatever the purveyor's mental state." *Id.* The obscene nature of the materials is a different inquiry than whether the

defendant knew "'the character and nature' of the materials he distributed." *Id.* at 76–77.

The reasoning here is the same. A threat is a threat, whatever the speaker's mental state. To secure a conviction under § 875(c), the government must prove that a defendant both made an objective "threat," and that he did so with the necessary subjective mental state.

We next examine what constitutes an objective "threat." "What is a threat must be distinguished from what is constitutionally protected speech." *Watts v. United States*, 394 U.S. 705, 707 (1969) (per curiam). Thus, the statement at issue must be a "true" threat. *Id.* at 708. "The 'true' in that term distinguishes what is at issue from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow (say, 'I am going to kill you for showing up late')." *Counterman*, 600 U.S. at 74 (citing *Watts*, 394 U.S. at 708). "True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Id.* (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)).

The Supreme Court has provided less guidance on whose perspective must be considered to determine whether a statement is a "true threat": the speaker's, the victim's, or a hypothetical reasonable person's. Process of elimination reveals the answer.

The answer cannot be the defendant speaker's perspective, or the "threat" element would be no different than the defendant's subjective mental state requirement. *See id.* ("Whether the speaker is aware of . . . the threatening aspect of the message is not part of what makes a statement a threat . . . ."). The answer also cannot be the victim's perspective. The victim of a threat could be a particularly

sensitive or paranoid individual, unable to determine whether the statement "taken in context" "convey[s] a *real* possibility that violence will follow." *See id.* (citing *Watts*, 394 U.S. at 708) (italics added). Thus, whether a statement is a "threat" must be judged through the eyes of a reasonable person. Indeed, without a reasonable person standard, a defendant could be convicted without ever having uttered a true threat—both the threat's author and the threat's target could have unreasonable assessments.

*Watts* is illustrative. In *Watts*, the Supreme Court determined that a protestor's remarks about President Lyndon B. Johnson were merely "political hyperbole," not a true threat. *See* 394 U.S. at 708 (remanding for a judgment of acquittal). The Court never considered whether the victim himself (the President) believed the statement to be a true threat. *See id.* at 707–08. Rather, the Court looked to the "context" of the statement. *Id.* at 708. The "context" included that the statement was "expressly conditional [in] nature," that the statement was made during a political rally, and that "the reaction" of those who witnessed the statement was laughter. *See id.* at 707–08. Although not explicit, the Court was deciphering whether a reasonable person would view the statement as a threat. Thus, we hold that § 875(c) requires both an objective "threat" element, as judged by a reasonable person, and a subjective mental state element.

This holding aligns with our cases interpreting similar threat statutes. *See United States v. Ehmer*, 87 F.4th 1073, 1121 (9th Cir. 2023) (deciding "the district court correctly included *both*" an objective element and a subjective element when instructing the jury on 18 U.S.C. § 372); *United States v. Keyser*, 704 F.3d 631, 638 (9th Cir. 2012) (deciding that whether a statement constitutes a threat under 18 U.S.C. § 876(c) "is governed by an objective standard"

and requires that the speaker must "subjectively intend to threaten"); *United States v. Bagdasarian*, 652 F.3d 1113, 1118 (9th Cir. 2011) (deciding in the context of threats made against a major candidate for President, under 18 U.S.C. § 879(a)(3), that both an objective and subjective element must be met).

Having determined that § 875(c) requires both an objective and a subjective element, we now turn to the jury instructions. Anten is correct that the district court's instructions could have been clearer. In describing what constitutes a "threat," the instructions did not mention the "reasonable person" standard and did not define a "threat" as a "serious expression." Nonetheless, we disagree with Anten that the district court omitted the statute's objective threat element. The district court instructed the jury that to convict Anten, it must find that he "knowingly transmitted in interstate commerce an electronic communication containing a threat to injure the person of another." The district court elaborated: "To determine whether or not the defendant transmitted a threat here, you should consider the circumstances under which the electronic communication was made, including its context with respect to surrounding conversation, the language the defendant used, and the reaction of those who received the electronic communication." This instruction tracked the reasoning in *Watts* and indicated that the jurors should determine whether there was a "threat," not from the perspective of Anten or Agent Sharif, but from the perspective of a reasonable person. The district court therefore did not omit § 875(c)'s objective element from its instructions and left no room for the jury to convict Anten based on a joke or hyperbole.

To the extent Anten contends that the instructions could have been more clearly formulated, we find no abuse of

discretion, though we intend for this opinion to aid district courts in formulating clearer instructions in future cases. *See United States v. Dixon*, 201 F.3d 1223, 1230 (9th Cir. 2000) ("If the district court's instructions fairly and adequately covered the elements of the offense . . . we review the instruction's 'precise formulation' for an abuse of discretion." (citation omitted)).

## III.

Finally, Anten asserts that the district court invaded the jury's province in its response to a jury note asking which exhibits were referred to in the indictment. In Anten's view, the district court enlisted itself as a factfinder and directed the jury to evidence supporting the charges.

The trial judge is "the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." *Quercia v. United States*, 289 U.S. 466, 469 (1933) (citation omitted). However, the trial court must not "employ procedures in the exercise of its discretion that will place it in the position of being a 'partner in the fact-finding process.'" *United States v. Evanston*, 651 F.3d 1080, 1087 (9th Cir. 2011) (citing *United States v. Walker*, 575 F.2d 209, 214 (9th Cir. 1978)). "We ordinarily review a district court's response to a jury question for abuse of discretion." *United States v. Ramirez*, 537 F.3d 1075, 1081 (9th Cir. 2008) (citing *United States v. Romero-Avila*, 210 F.3d 1017, 1024 (9th Cir. 2000)).

Here, the district court did not "place [itself] in the position of being a 'partner in the fact-finding process.'" *See Evanston*, 651 F.3d at 1087**.** The district court did not resolve a factual dispute when it answered the jury's question with an indisputably true statement: "Counts One and Two quote or reference Government Exhibits 1193,

1200, and 1203." By using the words "quote" and "reference," the district court simply observed that the indictment referred to the email exhibits—it did not suggest that the emails tended to prove the charges. This response was akin to reading the indictment to the jury, which the district court did. *See United States v. Atkinson*, 966 F.2d 1270, 1274 (9th Cir. 1992) ("The decision to read an indictment to the jury is within the sound discretion of the trial court." (citing *United States v. Polizzi*, 500 F.2d 856, 876 (9th Cir. 1974))). For these reasons, the district court did not err in its response to the jury note.

\* \* \*

We hold that § 875(c) requires both an objective threat element and a subjective mental state element. The district court did not err in its jury instructions, which included both elements. The district court also did not err in its response to the jury's note. We therefore affirm.

**AFFIRMED.**